**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JENNIFER L. PARSON, individually and as an Administrator of the Estate of MICHAEL BRADLEY PARSON, deceased, | ) ) ) ) ) | Case No. 24-cv-1493 |
| Plaintiff, | ) ) | Judge John Robert Blakey |
| v. | ) ) | |
| ALLSTATE INSURANCE COMPANY, | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendant's partial motion to dismiss, [33]. For the reasons explained below, the Court grants the motion and dismisses counts II, III, IV, and V of Plaintiff's Second Amended Complaint, [32].

**I.      The Allegations of the Complaint[1]**

Michael Parson owned an Allstate insurance agency in North Carolina and served as an Exclusive Agent ("EA") for the Allstate Insurance Company. [32] ¶ 11. Allstate EAs are independent contractors of Allstate who exclusively sell insurance policies on behalf of the corporation. *Id.* ¶ 17. To become an EA, an individual must execute an EA Agreement with Allstate, *id.* ¶ 18, and Parson was no exception: when he purchased an Allstate agency on September 14, 2014, he executed an EA

---

[1] This Court takes these facts from Plaintiff's Second Amended Complaint, [32], and accepts them as true for purposes of resolving the motion to dismiss. *See Killingsworth v. HSBC Bank Nevada*, 507 F.3d 614, 618 (7th Cir. 2007).

Agreement with Allstate. The executed EA Agreement between Allstate and an EA forms a valid contract under the laws of the State of North Carolina.[2] *Id.* ¶ 18.

Under the Agreement, an EA may transfer the economic interest in his "book of business," which represents the value of the EA's insurance policy sales. *Id.* ¶¶ 19, 22. According to the sample EA Agreement Plaintiff submitted, Allstate "retains the right in its exclusive judgment to approve or disapprove such a transfer." [15] at 9.

Allstate's manual instructs that, upon termination of an EA based upon the death of the EA, the EA or his "legal representative may elect to transfer your interest in the book of business serviced by your agency to an approved buyer, or elect to receive a termination payment from the Company." [15] at 51. "If such election is not made or the economic interest is not transferred to an approved buyer within 90 days of termination of the [EA] Agreement (or such longer period within the Company's discretion), the termination payment will be processed." *Id. See also* [32] ¶ 23 (alleging that, upon termination of the EA Agreement, an EA has 90 days to sell the economic interest in his book of business to an Allstate-approved buyer, and, if the EA does not complete the approval process, the EA will instead receive a termination payment from Allstate). Under the EA Agreement, Allstate enjoys broad discretion to approve or deny the sale of an EA's economic interest. *Id.* ¶ 24. Allstate's EA Independent Contractor Manual explains that a transfer of interest in EA Agreement "requires prior written consent of the Company. Such consent may be

---

[2] Strangely, neither party attached the executed EA Agreement to its pleading (Plaintiff attached an unsigned template of the agreement to her complaint, *see* [15]). But the parties apparently do not dispute that a valid, enforceable EA Agreement existed between Parson and Allstate.

given in the Company's sole discretion and the Company's decision as to whether or not to render such consent will be final." [15] at 85. The EA Independent Contractor Manual explains that, upon termination, an EA "may sell your economic interest in the book of business serviced by your agency at any time provided the Company approves the buyer. The Company shall have the right to approve or disapprove the sale of the economic interest in the book at any time up until the time the transfer of the economic interest has occurred." *Id.* at 56.

On September 21, 2019, EA Michael Parson received the terrible news that he had a fatal health condition and likely had just 30 days to live. [32] ¶ 29. He outlived that prediction but tragically died on July 31, 2020. *Id.* ¶ 33.

In October, shortly after the Parsons received Mr. Parson's dreadful diagnosis, his wife, Jennifer Parson, met with an Allstate Field Sales Leader ("FSL"), Erin Means, to determine how Parson could preserve Mr. Parson's economic interest in his book of business. *Id.* ¶ 30. At that time, FSL Means informed Parson that transferring the economic interest between spouses would be "easy and automatic," especially if the agency was still operating; as a result, during Mr. Parson's illness, the agency "hired an employee with the necessary credentialing and licensing to keep the agency open and facilitate the sale for Mrs. Parson." *Id.* ¶ 31. The Parsons executed "legal documentation" naming Mrs. Parson as "Mr. Parson's legal representative," which "authorized her to act on behalf of the agency." *Id.* ¶ 32. Mr. Parson's will "specified that Mrs. Parson was to receive all his business assets and interests and was to act as legal representative on behalf of his businesses, including

his Allstate agency." *Id.* ¶ 33. And no one—neither FSL Means, nor anyone else at Allstate—told Parson that she needed to "execute an additional document specifying Mrs. Parson as the agency's legal representative upon Mr. Parson's passing." *Id.* ¶ 32.

After Michael Parson died, Jennifer spoke with another FSL, Ryan Drennon, who told her she had 90 days from the date of Mr. Parson's passing to sell the agency; Drennon also told Parson she needed to provide a death certificate and the agency's S-Corporation Articles of Incorporation. *Id.* ¶ 34. She sent Drennon the Articles of Incorporation on August 12, 2020, and later sent Allstate her husband's death certificate and will. *Id.* ¶ 36. Parson had just been contacted by a prospective buyer and requested the value of the book so she could negotiate a sale. *Id.* ¶ 35. On August 25, 2020, FSL Drennon told Parson that Allstate required a "Letter of Testimony authorized and signed by a judge with a raised seal to prove Mrs. Parson's legal right as an authorized representative of the S-Corporation and estate." *Id.* ¶ 38.

With the 90-day clock running, and with the COVID-19 pandemic impacting the courts' operations and Parson's ability to secure the Letter of Testimony, Parson asked FSL Drennon for an extension of the 90-day deadline to sell. *Id.* ¶ 39. Parson alleges that "FSL Drennon requested such an extension on Mrs. Parson's behalf on at least three separate occasions, and each time Allstate arbitrarily denied the extension." *Id.* ¶ 45.

Parson sent Allstate the requested Letter of Testimony shortly after the judge signed it on September 10, 2020. *Id.* ¶ 46. On September 11, 2020, Parson told FSL

4

Drennon that two veteran Allstate agents, Art and Gigi Stover, were interested in buying Mr. Parson's agency book. *Id.* ¶ 48. On September 15, 2020, Allstate, through FSL Drennon, asked Parson to send a new photograph of the seal on the Letter of Testimony so Allstate could determine whether it was raised and also asked Parson to "sign a number of new documents"; she complied with these requests. *Id.* ¶ 50. Despite this, FSL Drennon told Parson Allstate intended to deny the sale of the agency book to the Stovers. *Id.* ¶ 51. Allstate's reasons for the denial were vague and seemingly baseless. *Id.* ¶ 52.

Plaintiff then contacted an insurance agency broker, Deb Dykes, whom she knew to be associated with Allstate, to facilitate the sale. *Id.* ¶ 53. On September 22, 2020, Dykes told Plaintiff that her leads—the Stovers and the prior prospective buyer—were not "serious" leads. *Id.* ¶ 55.

In October 2020, FSLs Means and Drennon were unavailable and Plaintiff struggled to communicate with Allstate. *Id.* ¶¶ 58–63. At the end of October 2020, Plaintiff requested that Allstate extend the 90-day deadline or approve the sale of the agency to the Stovers, but Allstate did neither. *Id.* ¶¶ 64–65.

On October 27, 2020, Allstate notified Mrs. Parson, via email from Allstate representative Brenda Trusch, that it was closing Mr. Parson's agency, effective October 30, 2020—in three days' time. *Id.* ¶ 66. Trusch sent Plaintiff a "thirty-day checklist" and told her she had just three days to complete it or she would lose her "termination payment." *Id.* Plaintiff completed the checklist on time and received the termination payment of approximately $223,000, which she claims fell well short

of the $480,000 she would have received in a sale of the business, "based upon commonly accepted agency valuation techniques." *Id*. ¶¶ 71–72. She claims Allstate's interference in the sales process thus robbed her of $257,000. *Id*. ¶¶ 73–74. Ultimately, Allstate gave Mr. Parson's book of business to an Allstate agent named Jason Pressley, whose agency was located forty-five minutes away. *Id*. ¶¶ 67–68.

On July 29, 2022, Parson and two other Plaintiffs sued Allstate, alleging that Allstate breached each Plaintiff's EA Agreement by interfering with agency sales. *See Parson et al v. Allstate Ins. Co.*, No. 1:22-cv-03962 (N.D. Ill.); [32] ¶ 126. On August 4, 2023, Judge Coleman, to whom the initial matter was assigned, severed Plaintiff Parson's claims from those of two other plaintiffs, and the matter was reassigned to this Court. *See* [32] ¶ 128; *Parson*, No. 1:22-cv-03962 [28]. Plaintiff then filed an Amended Complaint on April 25, 2024 [8], and, when Allstate moved to dismiss [24], Plaintiff filed a Second Amended Complaint ("SAC") on June 24, 2024 [32].

Plaintiff's SAC alleges that: (1) Allstate breached the EA Agreement by: obscuring the requirements to formally allow Mrs. Parson to take control of the agency prior to Mr. Parson's death, refusing to timely recognize her as such, refusing to extent the 90-day sale deadline, stringing her along during that period, refusing to approve the sale of the agency to the Stovers, refusing to consider other potential buyers, and refusing to communicate with Mrs. Parson regarding potential buyers; (2) Allstate breached the implied covenant of good faith and fair dealing in the EA

Agreement by: failing to recognize her as the legal representative of her husband's agency, arbitrarily refusing to communicate with her, and interfering with her efforts to sell the agency; (3) Allstate tortiously interfered with Parson's prospective economic advantage when it interfered with her ability to sell the agency to the Stovers; (4) Allstate committed fraud when it withheld additional documentation from Mrs. Parson to preclude her from formally being recognized as the legal representative of her husband's agency; and (5) Allstate's handling of this matter constitutes the negligent infliction of emotional distress. [32] ¶¶ 75–117.

Allstate moves to dismiss all but the breach of contract claim for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *See* [33].

## II.  Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must provide a "short and plain statement of the claim" showing that the pleader merits relief, Fed. R. Civ. P. 8(a)(2), so the defendant has "fair notice" of the claim "and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A complaint must also contain "sufficient factual matter" to state a facially plausible claim to relief—one that "allows the court to draw the reasonable inference" that the defendant committed the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  This plausibility standard "asks for more than a sheer possibility" that a defendant acted unlawfully. *Id.*  In evaluating a complaint under Rule 12(b)(6), this Court accepts all well-pleaded allegations as true and draws all reasonable inferences

in the plaintiff's favor. *Id.* This Court does not, however, accept a complaint's legal conclusions as true. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

## III. Analysis

Allstate moves to dismiss Plaintiff's claims for breach of the implied covenant of good faith and fair dealing (count II), tortious interference (count III), fraud (count IV), and negligent infliction of emotional distress (count V). Before turning to the merits of the parties' arguments, the Court must decide what law to apply when analyzing the sufficiency of Plaintiff's allegations.

### A. Choice of Law

A federal court sitting in diversity[3] looks "to the choice-of-law rules of the forum state to determine which state's law applies' to the issues before it." *Sosa v. Onfido, Inc.,* 8 F.4th 631, 637 (7th Cir. 2021) (quoting *Heiman v. Bimbo Foods Bakeries Distrib. Co.*, 902 F.3d 715, 718 (7th Cir. 2018)). "Under Illinois choice-of-law rules, forum law is applied 'unless an actual conflict with another state's law is shown, or the parties agree that forum law does not apply.'" *Id.* (quoting *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 808 (7th Cir. 2020)). "A district court is required to engage in a choice of law analysis only 'if there is a conflict between Illinois law and the law of another state such that a difference in law will make a difference in the outcome.'" *Bd. of Forensic Document Examiners, Inc. v. Am. Bar Ass'n*, 922 F.3d 827, 831 (7th Cir. 2019) (quoting *West Side Salvage, Inc. v. RSUI Indem. Co.*, 878 F.3d

---

[3] In suing Allstate here, Plaintiff invoked this Court's diversity jurisdiction; Plaintiff resides in North Carolina, Allstate is an Illinois corporation with its principal place of business in Northbrook, Illinois, and the amount in controversy exceeds § 1332(a)'s $75,000 threshold. *See* 28 U.S.C..§ 1332(a)(1).

219, 223 (7th Cir. 2017)). The party seeking a choice of law determination must "establish the existence of an outcome-determinative conflict." *Id; see also Sosa*, 8 F.4th at 637 ("The party seeking the choice-of-law determination bears the burden of demonstrating a conflict."); *Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co.*, 10 N.E.3d 902, 905 (Ill. 2014) ("A choice-of-law determination is required only when a difference in law will make a difference in the outcome.").

Moreover, the existence of an outcome-determinative conflict does not mean the Court automatically applies the non-forum state's law; rather, under Illinois' choice of law rules, the Court applies the law of the state with the "most significant relationship to the case." *Tanner v. Jupiter Realty Corp.,* 433 F.3d 913, 915–16 (7th Cir. 2006). Under this test, for a tort action, "the law of the place of injury controls unless Illinois has a more significant relationship with the occurrence and with the parties." *Id.* (citing *Esser v. McIntyre,* 661 N.E.2d 1138, 1141 (Ill. 1996)). And, in deciding whether this is so, courts consider: "(1) where the injury occurred; (2) where the injury-causing conduct occurred; (3) the domicile of the parties; and (4) where the relationship of the parties is centered." *Id.* (citing *Esser*, 661 N.E.2d at 1141). For contract claims, courts consider: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Bay Valley Foods, LLC v. FFI Grp., LLC*, 803 F. Supp. 3d 666, 676 (N.D. Ill. 2025), *reconsideration denied*, No. 23 C 14524, 2025 WL 3089109 (N.D. Ill. Nov. 5, 2025) (citing Restatement § 188(2)).

9

Here, the parties have not agreed to the application of another state's law. The EA Agreement "does not contain a choice-of-law provision," [32] ¶ 5. And, although she alleges in the SAC that North Carolina law applies, *id.* ¶ 6, Allstate does not agree but instead "takes no position" on the issue, claiming that Plaintiff's claims fail under both Illinois and North Carolina law anyway. [33] at 4 n.2. Given the absence of an agreement between the parties that North Carolina law applies, the Court will apply Illinois law unless Plaintiff demonstrates an outcome-determinative conflict with North Carolina law, *see Bd. of Forensic Document Examiners*, 922 F.3d at 831 (explaining that at the motion to dismiss stage, Illinois law must apply where the plaintiff failed to meet the burden of demonstrating a conflict of law by not identifying "any specific conflict in the laws of the pertinent states"), and also demonstrates that North Carolina has the "most significant relationship to the parties and the dispute."

With these principles in mind, the Court turns to Plaintiff's specific claims.

## B. The Sufficiency of Plaintiff's Allegations

### 1. Breach of the Implied Covenant of Good Faith and Fair Dealing (Count II)

In count II, Plaintiff alleges that Allstate breached the covenant of good faith and fair dealing implied in the EA Agreement. "Illinois law does not recognize independent claims based on breaches of any implied duties of good faith." *Echo, Inc. v. Whitson Co.*, 121 F.3d 1099, 1105–06 (7th Cir. 1997). "While all Illinois contracts contain an implied obligation to act in good faith, this obligation does not provide a person with a separate, independent cause of action." *Hickman v. Wells Fargo Bank N.A.,* 683 F. Supp. 2d 779, 793 (N.D. Ill. 2010) (citing *LaScola v. U.S. Sprint*

10

*Communications,* 946 F.2d 559, 565 (7th Cir.1991)); *see also Hartford Accident & Indem. Co. v. Lin,* 97 F.4th 500, 510 (7th Cir. 2024) ("In Illinois, the implied covenant of good faith and fair dealing is an interpretive tool of contract construction, ensuring only that parties 'do not try to take advantage of each other in a way that could not have been contemplated at the time the contract was drafted.'") (quoting *Cramer v. Ins. Exch. Agency,* 675 N.E.2d 897, 903 (Ill. 1996)); *Schwartz v. Opportunity Int'l, Inc.,* No. 14-CV-5775, 2015 WL 300591, at *3 (N.D. Ill. Jan. 21, 2015) ("Under Illinois law, the implied covenant of good faith and fair dealing is imputed into every contract, 'but a breach of good faith and fair dealing does not create an independent cause of action separate from the breach of contract claim'"; rather "good faith and fair dealing are used as construction aids in determining the parties' intent.") (first quoting *Cobb–Alvarez v. Union Pac. Corp.,* 962 F. Supp. 1049, 1055 (N.D.Ill. 1997); and then citing *Anderson v. Burton Assocs., Ltd.,* 578 N.E.2d 199, 203 (Ill. App. Ct. 1991)). "Courts regularly dismiss causes of action for breach of duty of good faith when they are not asserted within a breach of contract claim." *Hickman,* 683 F.Supp.2d at 793. And, indeed, here, Plaintiff's allegations in support of this claim remain redundant to the allegations asserted in support of her breach of contract claim. As a result, under Illinois law, Plaintiff's implied covenant of good faith and fair dealing claim fails.

North Carolina law is different. Under North Carolina law, "where a party's claim for breach of the implied covenant of good faith and fair dealing is based on the same acts as its claim for breach of contract," courts "treat the former as part and parcel of the latter." *Johnson Bros. Corp. v. City of Charlotte,* No. 23 CVS00 2076-

11

590, 2024 WL 807479, at *16 (N.C. Super. Feb. 27, 2024*), amended on reconsideration in part*, No. 23CVS002076-590, 2024 WL 2874564 (N.C. Super. June 7, 2024) (quoting *Cordaro v. Harrington Bank, FSB*, 817 S.E.2d 247, 256 (N.C. Ct. App. 2018). But that simply means that they "stand or fall together, not that the independent good faith and fair dealing claim should necessarily be dismissed as duplicative." *Id.* (quoting *Se. Anesthesiology Consultants, PLLC v. Rose*, No. 17 CVS 9002, 2019 WL 3948935, at *7 (N.C. Super. Ct. Aug. 20, 2019)). *But see Michael Borovsky Goldsmith LLC v. Jewelers Mut. Ins. Co.*, 359 F. Supp. 3d 306, 313–14 (E.D.N.C. 2019) ("North Carolina law recognizes 'a separate claim for breach of an implied covenant of good faith and fair dealing only in limited circumstances involving special relationships between parties, such as cases involving contracts for funeral services and insurance.").

Although the Fourth Circuit has expressly acknowledged that "North Carolina law is not crystal clear on the question," it has nonetheless held that a breach of the implied covenant of good faith and fair dealing claim "does not fail as a matter of law," even when based upon the same facts as a breach of contract claim. *Nadendla v. WakeMed*, 24 F.4th 299, 307–08 (4th Cir. 2022). As a result, if the Court were to apply North Carolina law, it would not dismiss count II just on this basis; the conflict thus may be outcome determinative.

Assuming the existence of an outcome-determinative conflict between Illinois and North Carolina law with respect to Plaintiff's claim for breach of the implied covenant, the Court must determine which state has the "most significant

12

relationship" to the matter, considering the place of contracting, the place of negotiation of the contract, the place of performance, the location of the subject matter of the contract, and the domicile, residence, nationality, place of incorporation and place of business of the parties." *Bd. of Forensic Document Examiners,* 922 F.3d at 831; *Bay Valley Foods,* 803 F. Supp. 3d at 676.

The parties' pleadings do not say where the EA Agreement was negotiated or executed; based upon the allegations in the SAC, Mr. Parson's agency was located in North Carolina and he presumably performed his obligations under the Agreement in that state, while Allstate likely performed its obligations under the Agreement in Illinois, its home state. Plaintiff alleges in the SAC that the connections to North Carolina "outweighs any connections to Illinois," [32] ¶ 6, and she represents in response to the motion to dismiss that "North Carolina law now governs this dispute." [36] at 11; *see also id.* at 11 n.11 (assuming without support that "North Carolina law" "indisputably governs this dispute"). But these are legal conclusions, which the Court need not accept. *Community Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803, 825 (7th Cir. 2018).

For present purposes, however, it remains irrelevant that the facts as alleged fail to conclusively demonstrate that North Carolina has the "most significant relationship to the occurrence and the parties." This is so because, as Allstate correctly notes, Plaintiff's claim still fails under North Carolina law, just for a different reason.

13

Allstate also argues that Plaintiff's breach of the implied covenant of good faith and fair dealing claim fails because, as Plaintiff concedes, the EA Agreement gave Allstate "sole discretion to approve or reject the sale of the Agency," and it cannot be held liable for "simply exercising its contractual right." [33] at 6. To be sure, under North Carolina law, "an asserted implied term cannot be used to contradict the express terms of a contract," *Hancock v. Americo Fin. Life & Annuity Ins. Co.,* 378 F. Supp. 3d 413, 431 (E.D.N.C. 2019), *aff'd,* 799 F. App'x 179 (4th Cir. 2020), and, if Plaintiff fails to demonstrate that Allstate's conduct constituted a breach the EA Agreement, she will likewise fail to demonstrate that such conduct breached any implied covenant. *E.g., ATV Broad., LLC v. Bahakel Commc'ns, Ltd.,* No. 3:20CV403-GCM, 2021 WL 134692, at *2 (W.D.N.C. Jan. 13, 2021) ("When a claim for breach of an implied covenant of good faith is based on factual allegations similar to those alleged in support of a breach of contract claim, the implied covenant claim is 'part and parcel' of the breach of contract claim and will rise and fall with the breach of contract claim."); *Hancock*, 378 F. Supp. 3d at 432 (The "implied duty of good faith concerns the parties' performance of obligations under the agreement, not the terms selected for the agreement.").

Plaintiff makes no effort to respond to the argument concerning Allstate's exercise of its contractual discretion, and she has thus waived the point. *E.g., Wojtas v. Cap. Guardian Tr. Co.*, 477 F.3d 924, 926 (7th Cir. 2007) (stating that failure to oppose an argument constitutes a waiver); *Cincinnati Ins. Co. v. E. Atl. Ins. Co.*, 260 F.3d 742, 747 (7th Cir. 2001) (explaining that a failure to mention or oppose an

14

argument gives rise to an inference of acquiescence, and "acquiescence operates as a waiver"). She argues simply that she had a "special relationship" with Allstate and her claim should thus be permitted to proceed. But that fact is not determinative under North Carolina law.

The Court dismisses Plaintiff's breach of the implied covenant of good faith and fair dealing claim, count II.

### 2. Tortious Interference With Prospective Economic Advantage (Count III)

In count III of the SAC, Plaintiff alleges that Allstate tortiously interfered with her prospective economic advantage. To state a claim for tortious interference with prospective economic advantage under Illinois law, a plaintiff must allege: "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *Grako v. Bill Walsh Chevrolet-Cadillac, Inc.*, 229 N.E.3d 869, 874-75 (Ill. App. Ct. 2023) (quoting *Voyles v. Sandia Mortgage Corp.*, 751 N.E.2d 1126, 1133 (Ill. 2001)).

Like most tort actions, the *prima facie* elements of tortious interference with prospective economic advantage require the plaintiff to show but-for causation and proximate causation. *Grako*, 229 N.E.3d at 880–81. Specifically, Plaintiff must show that, but for Allstate's actions, she would have realized a prospective economic advantage. *Id.* at 878–80. Construing the SAC in the light most favorable to Plaintiff,

15

the allegations fail to sufficiently allege causation with respect to this claim. *See Proft v. Raoul,* 944 F.3d 686, 690 (7th Cir. 2019). A plaintiff must show more than just that the defendant "succeeded by ending the business relationship or interfering with the expectancy; rather, purposeful interference—a showing that the defendant has committed some impropriety—is needed." *Grako,* 229 N.E.3d at 878 (quotation omitted).

Plaintiff concedes in the SAC that the EA Agreement gave Allstate "sole contractual discretion to approve or reject" a buyer of Mr. Parson's agency." [32] ¶ 83. She cites the EA Agreement's consistent and repeated theme "that Allstate is allowed broad discretion in approving or denying sales." *Id.* ¶ 24. Although she alleges facts suggesting that Allstate may have had a reasonable basis to allow the sale, she does not allege facts to support an inference that Allstate's denials fell outside the scope of its sole discretionary right to deny a sale of the agency; she alleges that the denial was "baseless," but that is a legal conclusion, unsupported by facts or reference to the EA Agreement. She does not allege, in other words "an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy." As a result, her claim fails under Illinois law.

Although Plaintiff has failed to demonstrate the existence of an outcome-determinative conflict between Illinois and North Carolina law with respect to this claim, the Court observes that Plaintiff's claim would similarly fail under North Carolina law.

16

Under North Carolina law, "a claim for tortious interference with prospective economic advantage arises when a party interferes with a business relationship 'by maliciously inducing a person not to enter into a contract with a third person, which he would have entered into but for the interference, ... if damage proximately ensues, when this interference is done not in the legitimate exercise of the interfering person's rights.'" *Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan Sports Enters., Inc.*, 546 F. Supp. 3d 440, 454 (M.D.N.C. 2021) (quoting *Spartan Equip. Co. v. Air Placement Equip. Co.*, 140 S.E.2d 3, 11 (N.C. 1965)). "A complainant's 'mere expectation of a continuing business relationship is insufficient to establish such a claim'; rather, a complainant must allege that 'a contract would have resulted but for defendant's malicious intervention.'" *Id.* (quoting *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 784 S.E.2d 457, 463 (N.C. 2016). "Conclusory indications that a contract would have been formed but for a party's conduct, without more, are not sufficient to state a claim for relief." *Id.*

Here, Plaintiff's claim remains premised upon a "mere expectation" that Allstate would approve the sale of the agency; Plaintiff fails to sufficiently support her conclusory allegation that she would have sold the agency but for Allstate's interference.

Because Plaintiff's claim fails as a matter of law, the Court dismisses count III.

### 3. Fraud (Count IV)

In count IV, Plaintiff alleges fraud, though her allegations suggest she may instead seek to assert a claim of fraudulent concealment. Either way, Federal Rule

17

of Civil Procedure 9(b)'s heightened pleading standard applies, and Plaintiff must "state with particularly the circumstances constituting the fraud." Fed. R. Civ. P. 9(b); *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 569, 571 (7th Cir. 2012) ("Under the heightened federal pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure, a plaintiff alleging fraud must state with particularity the circumstances constituting fraud"; the "heightened pleading standard of Rule 9(b) also applies to fraudulent concealment claims.") (quoting *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007)). To satisfy the Rule, a plaintiff must describe the "who, what, when, where, and how of the fraud." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011). Put differently, Rule 9(b) requires that allegations of fraud have "precision and some measure of substantiation." *Id.* at 442.

To state a claim for fraud under Illinois law, Plaintiff must allege: "(1) a false statement or omission of a material fact; (2) the defendant's knowledge or belief that the statement was false; (3) the defendant's intent to induce the Plaintiff to act; (4) the plaintiff's reliance upon the truth of the statement; and (5) damages to the plaintiff resulting from his reliance on the statement." *McMahan v. Deutsche Bank AG*, 938 F. Supp. 2d 795, 803–04 (N.D. Ill. 2013) (citing *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584 (Ill. 1996)). To state a claim for fraudulent concealment, Plaintiff must allege the basic elements of fraud and also "allege that the defendant concealed a material fact when he was under a duty to disclose that fact to plaintiff." *Id.* at 805.

18

Here, Plaintiff alleges in the SAC that "Allstate, through FSL Means and other representatives, concealed from Mrs. Parson there was additional specific documentation to be completed by Mr. Parson prior to his passing for Mrs. Parson to be recognized as the legal representative of his agency, despite Mrs. Parson requesting to meet with and meeting with FSL Means for the express purpose of getting Mr. Parson's Allstate affairs in order prior to his passing." [32] ¶ 105. She further alleges that she "did not have any other reasonable means of learning of this additional documentation." *Id.* She alleges, upon information and belief, that: "Allstate intentionally withheld this additional documentation from Mrs. Parson so that Allstate would not timely recognize Mrs. Parson as the legal representative of the agency following Mr. Parson's passing"; "Allstate's failure to timely recognize Mrs. Parson as the legal representative of the agency was intended to prevent her from selling Mr. Parson's agency within the ninety-day timeframe"; and Allstate intended to prevent the sale of Mr. Parson's agency to give Mr. Parson's book to an existing Allstate agent because it was more cost-effective for Allstate to reassign the book of business than allow it to be sold." [32] ¶¶ 106, 107, 109. She alleges that, as a result of Allstate's intentionally withholding this documentation, Allstate did not recognize Mrs. Parson as the legal representative of the agency until the window to sell the agency was nearly closed, resulting in Mrs. Parson being unable to sell the agency." *Id.* ¶ 108.

Plaintiff fails to explain the "who, what, where, when, how, or why" as to any false statement or omission of a material fact; she references additional

19

documentation, but she does not explain what documentation she's talking about (Is it the Letter of Testimony? The will and articles of incorporation? The photograph of the seal? Something else?); nor does she allege that the documentation called required was really not required. She fails to allege that Allstate made any false statement or omission, alleging, at best, that Allstate demanded additional documentation later than she would have liked (that is, in a manner that would have given her more time to negotiate a sale).[4]

Additionally, her allegations aimed at establishing Allstate's intent to induce her to act remain predicated upon her "information and belief," and such allegations generally fail to satisfy Rule 9(b)'s particularity requirement. *Pirelli*, 631 F.3d at 442 (citing *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992)).[5]

The Court dismisses count IV based upon Plaintiff's failure to satisfy Rule 9(b)'s heightened pleading standard.

---

[4] Plaintiff's failure to satisfy Rule 9(b) dooms her claim under North Carolina law as well. *E.g., Zurich Am. Ins. Co. v. Casey's Auto Serv., Inc.*, No. 1:19CV957, 2020 WL 5633355, at *3 (M.D.N.C. Sept. 21, 2020) (explaining that "federal pleading standards are procedural, not substantive, rules" and therefore finding that Rule 9(b)'s heightened pleading applies to a North Carolina fraud claim asserted in a diversity case). Additionally, her failure to allege facts to suggest that Allstate made a false representation or concealed a material fact or that Allstate did so with an intent to deceive likewise dooms her fraud claim under North Carolina law. *See, e.g., Olympus Managed Health Care, Inc. v. Am. Housecall Physicians, Inc.*, 662 F. Supp. 2d 427, 438 (W.D.N.C. 2009) (explaining that, under North Carolina law, to state a claim of fraud, a plaintiff must allege: "(1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party.") (citing *Rowan Cnty. Bd. of Educ. v. U.S. Gypsum Co.*, 418 S.E.2d 648, 658 (N.C. 1992)). (Rule 9(b)'s heightened pleading applies to a North Carolina fraud claim asserted in a diversity case).

[5] Although an exception to the "general rule that fraud cannot be pled based on information and belief" may exist if "the facts constituting the fraud" are not "accessible to the plaintiff" and if plaintiff provides "the grounds for his suspicions," *Pirelli*, at 442–43 (quoting *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 924 (7th Cir. 1992)), Plaintiff's allegations fall short of plausibly suggesting that the exception applies. Plaintiff fails to plead any facts to support her "suspicion" that Allstate intentionally withheld material documentation from her for its own financial advantage.

### 4. Negligent Infliction of Emotional Distress (Count V)

In count V, Plaintiff alleges negligent infliction of emotional distress.

To state a claim for negligent infliction of emotional distress under Illinois law, "a plaintiff must allege the traditional elements of negligence: duty, breach, causation, and damages." *Doe v. Loyola Univ. of Chicago*, No. 18 C 7335, 2019 WL 3801819, at *3 (N.D. Ill. Aug. 13, 2019). Plaintiff must also satisfy the "impact' rule"—that is, she must show that her "emotional distress 'was accompanied by a contemporaneous physical injury to or impact on the plaintiff.'" *Id.* (first quoting *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 703 (7th Cir. 2009); and then citing *Rickey v. Chi. Transit Auth.*, 457 N.E.2d 1, 2 (Ill. 1983)).

Plaintiff alleges that Allstate negligently mishandled the agency transfer after Mr. Parson's death and that, as a direct and proximate result of Allstate's negligent acts, she "suffered severe emotional distress which manifested itself in sleeplessness, headaches, nervousness and anxiety." [32] ¶¶ 114, 116. Because Plaintiff does not allege a contemporaneous physical injury or impact, her claim fails under Illinois law.

North Carolina law is different. "The substantive elements of negligent infliction of emotional distress are: '(1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress ..., and (3) the conduct did in fact cause the plaintiff severe emotional distress.'" *Acosta v. Byrum*, 638 S.E.2d 246, 250 (N.C. Ct. App. 2006) (quoting *Johnson v. Ruark Obstetrics*, 395 S.E.2d 85, 97 (N.C. 1990)). Although a party claiming negligent infliction of emotional distress in North Carolina must show

21

"severe emotional distress," which courts have defined as "any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so," *Horne v. Cumberland Cnty. Hosp. Sys., Inc.*, 746 S.E.2d 13, 19–20 (N.C. Ct. App. 2013) (citing *Johnson*, 395 S.E.2d at 97), North Carolina does not require "physical impact or injury." *Farrish v. Carolina Com. Heat Treating, Inc.,* 225 F. Supp. 2d 632, 637–38 (M.D.N.C. 2002) (citing *Dickens v. Puryear*, 276 S.E.2d 325 (N.C. 1981); *Johnson*, 395 S.E.2d at 85).

In light of the above, Plaintiff's failure to allege any physical injury or impact, by itself, would not doom her NIED claim under North Carolina law. But, as above, the existence of this outcome-determinative conflict ultimately remains immaterial because, even if the Court were to find that North Carolina has the "most significant relationship" to this case,[6] Plaintiff's claim fails under North Carolina law as well for at least two reasons.

First, although Plaintiff alleges that she suffered "severe emotional distress," the distress she specifically alleges she suffered—sleeplessness, headaches, nervousness, and anxiety—falls outside North Carolina courts' definition of that term. Although, as Plaintiff correctly notes, an "actual diagnosis by a medical

---

[6] As above, the issue is far from clear. In the context of a tort claim, the Court determines which state has the "most significant relationship to the case" by looking at the place of injury, including where the injury occurred, where the injury-causing conduct occurred, the domicile of the parties, and where the relationship of the parties is centered. *Tanner*, 433 F.3d at 915–16. Plaintiff suffered injury in North Carolina; the injury-causing conduct likely occurred (or at least initiated) in Illinois; the parties' domiciles cancel each other out; and the parties' relationship remains centered in both states.

22

professional is not required to assert severe emotional distress," *Russ v. Causey*, 732 F. Supp. 2d 589, 606 (E.D.N.C. 2010), a plaintiff "must 'at least forecast some evidence showing severe and disabling psychological problems.'" *Id.* (quoting *Fox–Kirk v. Hannon*, 542 S.E.2d 346, 356 (N.C. Ct. App. 2001)). Plaintiff's allegations fail to forecast such evidence.

More significantly, North Carolina courts "repeatedly dismiss negligent infliction of emotional distress claims where plaintiffs only allege intentional conduct on the part of the tortfeasor." *Lambertus v. Nuvo Sols., Inc.,* No. 5:23-CV-451-BO-RJ, 2024 WL 3363564, at *7 (E.D.N.C. July 10, 2024) (citing *S.P. by & through Prybol v. St. David's Sch.*, No. 5:22-CV-201-FL, 2023 WL 6447228, at *5 (E.D.N.C. Sept. 29, 2023) (listing cases)); *see also Horne*, 746 S.E.2d at 19 (Plaintiff's "NIED claim is premised on allegations of intentional—rather than negligent—conduct" and such allegations, "even when construed liberally on a motion to dismiss, cannot satisfy the negligence element of an NIED claim."). That is so here. Although she alleges in connection with her NIED claim that Allstate "negligently mishandled the agency transfer," the allegation remains conclusory and unsupported. The facts relating to Allstate's misconduct all concern intentional conduct.

Plaintiff alleges that Allstate breached the EA Agreement by:

concealing from Mr. and Mrs. Parson the required documentation for Mrs. Parson to be recognized as the legal representative of Mr. Parson's agency prior to Mr. Parson's death; refusing to timely recognize Mrs. Parson as the legal representative of Mr. Parson's Allstate agency despite having a valid will and signed testimony; refusing to extend the timeframe for Mrs. Parson to sell the agency while arbitrarily preventing Mrs. Parson from negotiating with potential buyers; referring Mrs. Parson to a broker who attempted to convince Mrs.

> Parson to postpone finding a buyer as the timeframe to sell expired before Allstate approved a sale; misleading Mrs. Parson that Allstate would grant Mrs. Parson an extension to sell the agency and that Allstate would approve the sale of the agency to Art and Gigi Stover; refusing to consider potential buyers who had previously been approved by Allstate to purchase Allstate agencies; and refusing to communicate with Mrs. Parson regarding potential buyers.

[32] ¶ 79. These are intentional acts. She alleges that Allstate intentionally interfered with her efforts to sell the agency, [32] ¶¶ 96–97; that Allstate "intentionally withheld documentation" to preclude her from being recognized as the legal representative of her husband's agency, [32] ¶¶ 106, 108; that Allstate "intended to prevent the sale of Mr. Parson's agency, *id.* ¶ 109. Even in connection with her NIED claim, Plaintiff alleges only deliberate, intentional acts: "refusing to recognize Plaintiff as the legal representative of the agency, making misrepresentations regarding granting an extension to sell, and improperly denying the sale." [32] ¶ 114. As in *Horne*, such allegations, "even when construed liberally on a motion to dismiss, cannot satisfy the negligence element of an NIED claim." 746 S.E.2d at 19.

The Court dismisses Plaintiff's NIED claim, count V.

## IV. Conclusion

For the foregoing reasons, the Court grants Allstate's motion to dismiss [33] and dismisses Plaintiff's breach of the covenant of good faith and fair dealing, tortious interference, fraud, and negligent infliction of emotional distress claims, counts II, II, IV, and V. Additionally, because Plaintiff has already had several opportunities to

24

amend her complaint,[7] the Court finds that further amendment would be futile, and thus dismisses these claims with prejudice. *See, e.g., Tribble v. Evangelides*, 670 F.3d 753, 761 (7th Cir. 2012), *as amended* (Feb. 2, 2012) ("Although we recognize that 'leave to amend should be freely given' that does not mean it must always be given. District courts have broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile.").

Date: March 23, 2026

Entered:

John Robert Blakey
United States District Judge

---

[7] Plaintiff filed an initial complaint [1] and an amended complaint [14] in the prior action, *Parson v. Allstate Insurance Company*, No. 22-cv-03962 (N.D. Ill.), and, after her case was reassigned to this Court, she amended twice more, filing an amended complaint [8] on April 25, 2024, and then filing the SAC [32] on June 24, 2024.